George Forman (SBN 047822)
Jay B. Shapiro (SBN 224100)
Margaret C. Rosenfeld (SBN 127309)
FORMAN & ASSOCIATES
4340 Redwood Highway, Suite E352
San Rafael, CA 94903
Telephone: 415/491-2310
Facsimile:  415/491-2313
george@gformanlaw.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

AUGUSTINE BAND OF CAHUILLA INDIANS, a federally recognized Indian Tribe,

                    Plaintiff,

    vs.

STATE OF CALIFORNIA, and GAVIN NEWSOM IN HIS OFFICIAL CAPACITY AS GOVERNOR OF CALIFORNIA,

                    Defendants.

Case No.:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER 25 U.S.C. § 2710(d)(7)(A)**

     Plaintiff, the Augustine Band of Cahuilla Indians ("Augustine" or "Tribe,"), by and through its attorneys of record herein, complains and alleges as follows:

### JURISDICTION

    1.    This Court has original jurisdiction over the subject matter of Augustine's action pursuant to 25 U.S.C. § 2710(d)(7)(A), 28 U.S.C. §§ 1331 and 1362, in that Augustine is an Indian Tribe with a governing body duly recognized by the Secretary of the Interior, and this action arises under the Indian Gaming Regulatory Act of 1988, 25 U.S.C. § 2701, *et seq.* ("IGRA"), based on Augustine's claim that the State of California ("State") has failed to negotiate in good faith for a new Tribal-State Compact authorizing Augustine to continue operating class III gaming activities on the Augustine Indian Reservation in Riverside County, California beyond

COMPLAINT                             1

1   the June 30, 2022 expiration date of the current Compact between Augustine and the State.

2       2.    Defendant State affirmatively has waived its sovereign immunity to this action

3   pursuant to Calif. Gov't. Code § 98005.

4                       **VENUE**

5       3.    Venue in this action lies in this District pursuant to 28 U.S.C. § 1391(b)(1) and

6   California Code of Civil Procedure § 401, in that the State's seat of government is located within

7   the Eastern District of California the State's Attorney General maintains an office in Fresno

8   County, California, within the Eastern District of California.

9                      **PARTIES**

10      4.    Augustine is listed in the Federal Register, 86 Fed. Reg. 7554 (Jan. 29, 2021), as

11   an Indian entity recognized by and eligible to receive services from the United States Bureau of

12   Indian Affairs, and has a governing body recognized by the Secretary of the Interior.

13      5.    Defendant State is a state of the United States.

14      6.    Defendant Gavin Newsom is the State's duly-elected Governor, and is sued in his

15   official capacity.  The Governor is authorized by State law to enter into compact negotiations,

16   reach agreement, and execute compacts with tribes pursuant to IGRA.  See Cal. Const. Art. IV, §

17   19(f).

18               **FACTUAL ALLEGATIONS**

19      7.    Augustine realleges each of the allegations set forth in Paragraphs 1 – 6 above,

20   and by this reference incorporates each such allegation herein as if set forth in full.

21      8.    Augustine is the beneficial owner of, and exercises governmental authority over,

22   the lands of the Augustine Indian Reservation ("Reservation"), located in an unincorporated

23   portion of Riverside County, California.  The United States has held legal title to the lands of the

24   Reservation in trust for Augustine since before October 17, 1988, thus constituting the

25   Reservation as "Indian country" within the meaning of 18 U.S.C. § 1151, and "Indian lands" as

26   defined in 25 U.S.C. § 2703(4).

27      9.    In 2000, Augustine and the State executed a Compact ("2000 Compact") pursuant

28   to IGRA that took effect on or about July 6, 2000, when notice was published in the Federal

1    Register that the Compact had been approved by the Department of the Interior.  Augustine's

2    2000 Compact will expire on June 30, 2022.

3         10.     Pursuant to and in compliance with the terms of its 2000 Compact, Augustine

4    constructed, owns and operates the Augustine Casino ("Casino") on the Reservation.

5         11.     IGRA categorizes gaming into three "Classes": social games for prizes of minimal

6    value, and ceremonial games ("Class I"); bingo and games similar to bingo, including electronic,

7    computer or other technologic aids to such games, and non-banking card games, to the extent

8    such games either are expressly authorized or not expressly prohibited by State law ("Class II");

9    and all other forms of gaming, including slot machines ("Gaming Devices") and "banked games"

10   (*e.g.*, blackjack, in which the "house" or "bank" takes on all comers, paying all winners and

11   collecting from all losers) ("Class III").

12        12.     IGRA preempted whatever jurisdiction the State may have had to enforce its

13   gambling laws in Indian country.  Under IGRA, 25 U.S.C. § 2710(d)(3)(A), in order to lawfully

14   conduct Class III gaming activities on its Indian lands, Augustine must, *inter alia*, request the

15   State to enter into negotiations for a tribal-state compact setting forth the terms and conditions

16   under which Augustine may conduct Class III gaming activities, and the State is obligated to

17   enter into and conduct those negotiations in good faith.

18        13.     IGRA, 25 U.S.C. § 2710(d)(3)(C), provides that a compact may include provisions

19   relating to –

20        (i)     the application of the criminal and civil laws and regulations of the Indian

21   tribe or the State that are directly related to, and necessary for, the licensing and regulation of

22   such [Class III gaming] activity;

23        (ii)    the allocation of criminal and civil jurisdiction between the State and the

24   Indian tribe necessary for the enforcement of such laws and regulations;

25        (iii)   the assessment by the State of such [Class III gaming] activities in such

26   amounts as are necessary to defray the costs of regulating such [Class III gaming] activity;

27        (iv)    taxation by the Indian tribe of such [Class III gaming] activity in amounts

28   comparable to amounts assessed by the State for comparable activities;

COMPLAINT                                    3

1                (v)     remedies for breach of contract;

2                (vi)    standards for the operation of such [Class III gaming] activity and

3 maintenance of the gaming facility, including licensing; and

4                (vii)   any other subjects that are directly related to the operation of [Class III]

5 gaming activities.

6       14.     IGRA, at 25 U.S.C. § 2710(d)(4) does not authorize the State or any of its

7 political subdivisions to impose a tax, fee or other assessment on Augustine via a Class III

8 gaming compact, but permits the State to negotiate the payment of fees to defray the State's

9 actual regulatory costs incurred in connection with a compact.

10       15.    Augustine's 2000 Compact with the State of California authorizes Augustine to

11 operate up to two Gaming Facilities, up to 2,000 Gaming Devices (*i.e.*, slot machines), banked

12 and percentage card games, and games and devices that State law authorizes to the California

13 State Lottery.

14       16.    On September 1, 1999, Augustine did not operate any Gaming Devices.  Under §

15 4.3.1(b) of Augustine's 2000 Compact, Augustine was entitled to operate 350 Gaming Devices.

16 Under § 4.3.2.2(a) of Augustine's 2000 Compact, in order to operate more than 350 Gaming

17 Devices, Augustine must draw licenses from a statewide pool of Gaming Device licenses created

18 by Augustine's and other materially identical Compacts, and for each license drawn, pay into the

19 Indian Gaming Revenue Sharing Trust Fund ("RSTF") a non-refundable, one-time pre-payment

20 fee of $1,250, and for licenses in excess of the first 350 drawn, pay into the RSTF an annual

21 license fee of between $900 and $4,350 for each Gaming Device license maintained.  Augustine

22 currently possesses Gaming Device licenses that will expire along with the statewide pool of

23 Gaming Devices licenses upon expiration of Augustine's 2000 Compact and other materially

24 identically compacts on June 30, 2022.

25       17.    By letter dated August 9, 2019, Augustine formally requested the State to enter

26 into negotiations for a new Compact to replace Augustine's 2000 Compact on or before that

27 Compact expires.  By letter dated September 23, 2019, the State responded to that request.

28       18.    On December 30, 2019, Augustine sent the State a full draft of a proposed new

COMPLAINT              4

Compact to replace its 2000 Compact.  Between October, 2015 and September 17, 2021, Augustine and the State exchanged a series of written proposals and counter-proposals, and between February, 2020 and September 2, 2021, conducted at least nine formal negotiating sessions, initially in person, and then, due to the COVID-19 pandemic, via video conferencing. The last formal negotiating session between Augustine and the State's negotiating team occurred on September 2, 2021.

19.     On multiple occasions during the parties' negotiations, Augustine informed the State that several of the provisions that the State had included in each of its proposed Compact drafts were totally unacceptable, either because they are not proper subjects of negotiation under IGRA, or because the State was obligated to offer meaningful concessions in return but failed to do so, and requested that the State inform Augustine whether the State would insist that the provisions that Augustine had identified as unacceptable must be included in a new Compact.

20.     Among the State's proposed provisions to which Augustine repeatedly objected over time was the State's demand that Augustine enact a new Tribal Labor Relations Ordinance ("TLRO") to replace the TLRO that the State had approved in connection with Augustine's 2000 Compact.  In particular, Augustine objected to the State's demand that its new TLRO limit negotiations for a collective bargaining agreement to no more than 90 days, with an additional 30 days of mediation, after which the so-called "mediator" would resolve any remaining issues through binding interest arbitration.

21.     In preparation for the Compact negotiating session between Augustine and the State scheduled for February 11, 2021, even as it objected to the State's proposed TLRO as not being a proper subject of negotiation under IGRA, Augustine presented the State with the Tribe's proposed revisions to the State's proposed TLRO.  During the parties' February 11, 2021 negotiating session, the State's negotiator informed Augustine that, "The state is unwilling at this point to remove the provisions [of the State's proposed new TLRO] that include binding dispute resolution -- that include a binding dispute resolution mechanism but remain willing to discuss and negotiate provisions of the Compact."  During the same negotiating session, Augustine informed the State that,

The Tribe's position remains clear, that the provision that collective bargaining impasses must be resolved through binding interest arbitration, although the TLRO calls it mediation, is unacceptable. And that if the State, as it has indicated, does insist that the binding interest arbitration remain part of the TLRO, then we will not be able to reach agreement on the TLRO and, therefore, continue discussion of the other details of it would be a waste of time.  And the tribe is not prepared to submit to a labor relations regime that is unlike that to which any other California employer subject to the NLRB's jurisdiction is subject.

22.     In March, 2021, the State presented Augustine with a revised draft of the State's new TLRO that incorporated some of the changes that Augustine had proposed, but continued to include the 90-day limit on collective bargaining negotiations and binding interest arbitration provisions that Augustine previously had rejected.

23.     During the negotiating sessions between Augustine and the State on May 6, 2021, and June 7, 2021, Augustine reiterated its rejection of the State's demand that the Tribe enact a new TLRO that would impose a 90-day limit on collective bargaining negotiations and empower a union unilaterally to require that the Tribe submit to binding interest arbitration of collective bargaining impasses.

24.     On July 2, 2021, Augustine presented the State with a complete Compact draft that included as Appendix "D" Augustine's response to the State's March, 2021 revised draft TLRO.

25.     During the August 2, 2021 Compact negotiating session between Augustine and the State, Augustine informed the State that,

It is unacceptable to the Tribe to have a time of less than 180 days to negotiate an initial collective bargaining agreement. And it is absolutely unacceptable to have collective bargaining impasses resolved through binding interest arbitration. Our understanding, from the State's past statements is that those two, and in particular the binding interest arbitration provision, would have to be in the TLRO. And so we need to know, yes or no today, whether the State continues to insist that less than 90 -- less than 180 days be allowed for negotiating a collective bargaining agreement, and that any collective bargaining impasses must be resolved through binding arbitration. And we need to know that, yes or no.
And one more thing.  And that is what consideration -- What concessions is the State offering in exchange for this new, and from our prospective, deeply intrusive and discriminatory TLRO.

26.     During the August 2, 2021 Compact negotiating session between Augustine and the Tribe, the State responded to Augustine's statement as quoted in the preceding paragraph by indicating a willingness to discuss the issues of the time limit on collective bargaining negotiations and binding interest arbitration, but did not propose any alternative language on those issues.

27.     By the Compact negotiating session between Augustine and the State on August 25, 2021, the State had not responded to Augustine's proposed revisions to the State's new TLRO, but stated its willingness to do so in advance of the next negotiating session.

28.     In a letter dated September 2, 2021 from Augustine's counsel to the State's principal negotiator, Augustine informed the State that,

> As long as the State persists in imposing such a short period for negotiating a collective bargaining agreement and giving unions the unilateral power to require binding arbitration of collective bargaining impasses – something that the State cannot impose on its own subdivisions – and as long as the State continues to be coy about whether those two provisions must be included in a new TLRO, further discussion of the other aspects of the TLRO would be pointless.  If the State conditions a new Compact on Augustine's acceptance of a new TLRO that includes the State's short deadline for negotiating a collective bargaining agreement and giving unions unilateral power to require binding interest arbitration of collective bargaining impasses, then further Compact negotiations also would be futile.

> The State has had Augustine's most recent written response to the State's draft new TLRO since early July, 2021, but the State has been aware of Augustine's position on these two critical provisions since November, 2020.  If the State truly respects Augustine's status as a sovereign tribal government, and is not merely slow-walking these negotiations for strategic purposes, the State will tell Augustine *now* whether the two TLRO provisions Augustine consistently and repeatedly has rejected, as well as any of the other provisions about which the parties have not been able to attain tentative consensus, are deal-breakers for the State.  If they are deal-breakers, then we should declare these negotiations to have reached impasse, and a federal district court judge will determine whether or not the State has negotiated in good faith. However, if the State is open to the substantial concessions that Augustine is prepared to make in return for meaningful concessions from the State, then the State should respond *now* with the meaningful concessions, if any, the State is willing to offer in return.  Any responses short of that will confirm that the State is just engaged in surface bargaining, or so we will contend in Augustine's lawsuit alleging that the State has failed to negotiate in good faith.

COMPLAINT                                               7

29.   By September 17, 2021, the State had not responded to the Tribe's July 2, 2021 Appendix "D."

30.   In preparation for the August 2, 2021 Compact negotiating session between Augustine and the State, Augustine requested that the State provide,

> documentation for the State's past three fiscal years of the time expended and costs incurred by State Gaming Agency personnel on matters specifically relating to Augustine's casino, including site visits and desk audits. In addition, Augustine would appreciate receiving copies of any reports prepared in connection with such site visits and desk audits.

31.   In an e-mail dated July 30, 2021 transmitting the State's Compact draft for the August 2, 2021 negotiating session between Augustine and the State, the State responded as follows to Augustine's request for specific information about the State's regulatory costs at Augustine:

> As the State has shared several times and is demonstrated in the audit and budgetary documents that we have provided, this request reflects a misunderstanding of how regulatory activities in the State operate and are funded. We consolidate many regulatory functions to ensure an effective and efficient use of funds and we don't track many regulatory costs on a tribe-by-tribe basis. If we were to do so, it would create an incredible regulatory burden and raise the cost of regulation given that we have compacts or secretarial procedures with 78 tribes and administer revenue sharing going to 70 tribes. We can share some limited documentation reflecting a portion of the regulatory activities associated with Augustine's casino, but this would inherently not address many of the consolidated regulatory activities. This is why we have moved to a pro rata approach, so that the regulatory cost share is based on the size of the Tribe's facility, as determined by the number of Gaming Devices it operates. This helps ensure each gaming tribe is paying its fair share of the State's costs of regulation.

32.   Despite the State's admitted ability to "share some limited documentation reflecting a portion of the regulatory activities associated with Augustine's casino," the State never provided any Augustine-specific information about the cost of the State's regulatory activities at Augustine's casino.

33.   On September 2, 2021, a member of the State's negotiating team conferred with members of Augustine's negotiating team for the purpose of identifying and, if necessary, clarifying the language of provisions about which Augustine and the State had achieved tentative

COMPLAINT                                    8

consensus, and identifying those provisions about which tentative consensus had not been attained.

34. In a letter dated September 10, 2021, responding to the State's proposed revisions to its Appendix "C" (a list of activities to be categorically excluded from environmental review), Augustine's counsel also informed the State's principal negotiator that,

> Specifically regarding the TLRO, I've attached a copy of Augustine's July, 2021draft redlined against the State-approved TLRO appended to Augustine's current Compact. Unlike Augustine's 2000 Compact, its TLRO has no expiration date, so it's that ordinance, rather than the State's drafts, against which Augustine's proposed revisions should be measured. As you can see, Augustine has been willing to make numerous substantial changes to its State-approved TLRO even though, unlike in *Coyote Valley II*, the State has not offered any meaningful concessions in return. However, Augustine remains unwilling to agree to being coerced into an unrealistically short time limit for negotiating a collective bargaining agreement, or ceding to unions the unilateral power to subject Augustine's government to binding interest arbitration of a collective bargaining impasse, neither of which are embodied in the State's public policy as set forth in Labor Code § 923.

> As Augustine has indicated previously, it is willing to continue negotiating, but only if the State gives Augustine reason to believe that an acceptable new Compact can be concluded, executed by the Governor, ratified by the Legislature, reviewed by the Department of the Interior, and notice published in the Federal Register that the Compact has been approved or considered approved to the extent consistent with IGRA, on or before June 30, 2022. The only way the State can give Augustine reason to believe that further negotiations will be fruitful would be to promptly provide Augustine with a revised Compact draft – without waiting for another negotiating session to be scheduled – that substantially moves the State's positions on all of the remaining disputed issues much closer to Augustine's.

35. In a September 16, 2021 e-mail from the State's principal negotiator to Augustine's counsel, the State informed Augustine, among other things, that,

> You also raise the issue of the Tribal Labor Relations Ordinance (TLRO) in your recent correspondence. California Labor Code section 923, which you cite in your letter, highlights the State's interest in ensuring that unorganized workers at a tribal casino and related facilities can self-organize for collective bargaining to obtain acceptable terms of employment. A dispute resolution process that can resolve collective bargaining impasse facilitates this policy by avoiding labor unrest. Under the State's proposed process, only if a labor organization agreed to abide by the Tribe's

1
2
3
4
5

TLRO, to complete a secret ballot election during the one-year
Notice of Intent to Organize (NOIO) period, and not to strike or
picket during that NOIO period would binding dispute resolution
be available for a collective bargaining impasse. In the State's view,
requiring a labor organization to forgo concerted activities and
organize an election during this one-year NOIO period is a
reasonable compromise if there is a corresponding tribal
commitment to a binding resolution of collective bargaining
impasse.

6          36.     On September 17, 2021, Augustine's counsel sent an e-mail to the State's principal

7    negotiator that included the following:

8
9
10
11
12
13
14
15
16
17

Thank you for your September 16 response to my September 10
letter and September 9 and 14 e-mails, and thank you for
confirming, once and for all, that the State will condition its
agreement to a new Compact on, among other provisions, requiring
that Augustine replace its current State-approved TLRO with a new
TLRO that sets a 90-day time limit on collective bargaining
negotiations (plus another 30 days of true mediation) and
empowers a union unilaterally to require the Tribe to submit to
binding interest arbitration of collective bargaining impasses,
without ever attempting to justify why the Tribe should be deprived
of its rights as an employer subject to the NLRB's jurisdiction when
its employees now have full, federally protected organizational and
representational rights. Augustine has no interest in labor strife, but
a labor dispute at Augustine hardly is an issue of statewide -- or
even local -- concern such that the State can further tip the scales in
favor of third parties and employees that already enjoy full
organizational and representational rights under the National Labor
Relations Act.

18
19
20
21
22
23
24
25
26
27
28

As I'm sure you know, Augustine's current TLRO is identical to the
TLRO that was negotiated in 1999 directly between gaming Tribes
and organized labor, and thereafter was blessed by the State. In
1999, the NLRB had not yet asserted jurisdiction over tribal
casinos; that jurisdiction since has been upheld by the D.C.,
Sixth and Ninth Circuits. To deal with the State's concern that the
NLRB might at some future date lose jurisdiction, Augustine is
agreeable in that event to reinstating its current the TLRO, or even
its July 2, 2021 response to the State's March, 2021 draft TLRO.
Meanwhile, Augustine has maintained and continuously
abided by its TLRO since its Compact took effect; as recently as
earlier this year, it provided information about its casino workforce
in response to an information request made under Augustine's
TLRO by a union that respects the agreement that the Tribes and
organized labor made in 1999. Augustine had no role in drafting
the State's proposed new TLRO, but neither did the other Tribes on
which the State has imposed its new TLRO. Rather, as best can be
determined (the State won't admit who actually drafted it), the
State's new TLRO is the result of a deal first cut between Governor
Brown's administration and elements of organized labor, and
continued by Governor Newsom. Certain elements of organized
labor that agreed to the 1999 TLRO since have repudiated their
agreement, claiming that it doesn't work. The fact is that any union

COMPLAINT                                    10

claiming that the 1999 TLRO "doesn't work" hasn't tried to use it, at least not at Augustine. To be clear, Augustine is not anti-union or anti-employee; rather, it is pro-sovereignty, which is perfectly consistent with being supportive of its employees' rights, including the right to organize and be represented by a union of their free choice, but inconsistent with surrendering to the State's dictation of a discriminatory labor-management relations regime. Augustine has too much respect for its own laws and the rights and welfare of its employees to violate or repudiate its commitments; the State and organized labor should do the same, especially if Gov. Newsom meant what he said in his apology for the atrocities against California's Native peoples that the State has committed, countenanced or actively encouraged.

The State has made it abundantly clear that its strategy in these negotiations is to put the Tribe in the position of having to choose between continuing to negotiate against itself as time runs out on its current Compact, or terminating negotiations and suing the State for failing to negotiate in good faith. In the interest of reaching an agreement, Augustine has indicated its willingness to make concessions on numerous issues that simply haven't been problems under its 2000 Compact, even though Augustine considers many of those issues to be outside the proper scope of negotiation under IGRA. However, Augustine also has made abundantly clear that unless the State accepts as sufficient the concessions that Augustine tentatively has proposed in the body of its July 2, 2021 Compact draft (with the re-insertion of the State's secs. 12.3(g) and (h)), further negotiations would serve no purpose other than to consume more of the limited time remaining before Augustine's Compact expires on June 30, 2022. In short, it is the State's stonewalling that has created the current impasse in these negotiations, not Augustine's refusal to engage in productive negotiations.

37.     The State responded to the above-described September 17 e-mail from Augustine's counsel to the State's principal negotiator by several times professing its willingness to continue negotiations, and ultimately claiming that it was not insisting on its proposed TLRO's time limit on collective bargaining negotiations or binding interest arbitration of collective bargaining disputes, but without indicating whether it would accept Augustine's proffered concessions as sufficient or offering an actual counter-proposal to Augustine's July 2, 2021 response to the State's March, 2021 revised new TLRO.

38.     More than 180 days have elapsed since Augustine commenced negotiations with the State for a new Compact to replace its existing Compact, but the State has not agreed to enter into a new Compact on terms acceptable to Augustine, due to the State's insistence on new Compact provisions that would:

COMPLAINT                                    11

1

        (a)    require payment into the Indian Gaming Special Distribution Fund

2    ("SDF") of more than is reasonably necessary to defray the State's actual costs of regulating

3    Augustine's Gaming Activities;

4

        (b)    if Augustine were to operate more than 1,200 Gaming Devices, require

5    Augustine to pay 6% of its Net Win from Gaming Devices 351+ each year into the RSTF,

6    whether or not the balance in the RSTF is sufficient to assure that each federally recognized

7    California Tribe operating between zero and 350 Gaming Devices will receive up to $1.1 million

8    per year from the RSTF;

9

        (c)    permit the California Legislature to allocate any surplus in the RSTF

10    beyond what is necessary to distribute $1.1 million to each RSTF-eligible Tribe annually to the

11    State-created TNGF, rather than distributing any such surplus to RSTF-eligible Tribes in equal

12    shares as Augustine originally proposed;

13

        (d)    define "Gaming Facility" to include structures and other improvements on

14    Augustine's Indian lands in which no class III Gaming Activities occur;

15

        (e)    define "Gaming Operation" to include employees, activities, infrastructure

16    or functions that are not, themselves, directly related to and necessary for the regulation and

17    licensing of Augustine's class III Gaming Activities, or otherwise directly related to the operation

18    of class III Gaming Activities;

19

        (f)    require Augustine to enact an ordinance under which the Tribe not only

20    must prohibit, but also would be liable for claims of workplace discrimination, harassment and

21    retaliation and would be subject to money damages for such claims, when federal law

22    (specifically, Title VII and the ADA) expressly exempts the Tribe from the definition of

23    "employer," and thus liability for such claims;

24

        (g)    prohibit Augustine's Gaming Operation from cashing checks drawn by

25    anyone other than enrolled Augustine Tribal Members against any federal, State or city fund;

26

        (h)    require Augustine to comply with California's minimum wage law and

27    regulations for all Gaming Operation employees, including for employees not directly involved

28    in the operation of Gaming Activities;

COMPLAINT              12

(i)      require Augustine to carry liability insurance, waive sovereign immunity to, create remedies in money damages, and prescribe procedures for processing, claims for bodily injury, personal injury, or property damage allegedly sustained by Gaming Operation visitors and vendors;

(j)      require Augustine, subject to certain exceptions, to withhold and pay over to the State California income taxes from the wages of all Gaming Operation employees;

(k)      require Augustine to enact a new Tribal Labor Relations Ordinance that discriminates against the Tribe by depriving it of some rights conferred on other California employers subject to the National Labor Relations Act, while granting labor organizations more rights than those conferred by the National Labor Relations Act; and

(l)      effectively subject any development related to Augustine's Gaming Operation to review and mitigation under criteria established pursuant to the California Environmental Quality Act ("CEQA"), and under certain circumstances require Augustine to negotiate, and if necessary, arbitrate binding and enforceable mitigation agreements with surrounding non-tribal local jurisdictions and potentially the California Department of Transportation ("Caltrans").

39.      On multiple occasions in 2021, Augustine proposed that the State agree to extend the term of Augustine's 2000 Compact sufficiently beyond June 30, 2022 in order to allow more time to conclude negotiations before that Compact expires, and for the federal courts to determine which of the provisions set forth in Paragraph 38 above are or are not proper subjects for negotiation under IGRA, and for which provisions the State is required to offer meaningful concessions in return.

40.      The State consistently has rejected Augustine's proposals to extend the term of Augustine's 2000 Compact, expressing instead the State's desire to continue negotiations, but without making substantive changes to or offering meaningful concessions for the provisions to which Augustine has objected.

41.      At no time during the two years of Compact negotiations in which Augustine participated did the State offer any meaningful concession or concessions on an issue or issues

about which the State is not obligated to negotiate in good faith, in exchange for any of the

concessions the State demanded of Augustine.

## CLAIM FOR RELIEF

**The State Failed to Negotiate in Good Faith by Demanding Compact Provisions That Either Are Not Proper Subjects of Negotiation Under IGRA, Or If Not Improper *Per Se*, Failing To Offer Meaningful Concessions**

42.     Augustine hereby realleges each of the facts alleged in Paragraphs 1–41 above,

and by this reference incorporates each such reference herein as if set forth in full.

## COUNT ONE

**The State's Demand That Augustine Make Excessive Payments Into The Indian Gaming Special Distribution Fund ("SDF")**

43.     Throughout the negotiations, the State insisted that Augustine pay into the SDF

more than is necessary to defray the State's costs of regulating Augustine's class III Gaming

Activities.  In doing so, the State sought to impose a tax, fee, charge or other assessment on

Augustine's Gaming Activities in violation of IGRA; thus the State failed to negotiate in good

faith.

44.     If the State's demand that Augustine pay more into the SDF than necessary to

defray the State's costs related to regulation of Augustine's class III Gaming Activities did not

constitute bad faith *per se*, the State was required to offer meaningful concessions in return for

Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in

good faith.

## COUNT TWO

**State's Demand That Augustine Make Excessive Payments Into The Indian Gaming Revenue Sharing Trust Fund ("RSTF")**

45.     In class III gaming Compacts between the State and various other California

Tribes, the State has agreed to annual payments into the RSTF of as little as 1.2% of the Net Win

from Gaming Devices 351+ if a Tribe operates more than 1,200 Gaming Devices.  The State

insisted that if Augustine were to operate more than 1,200 Gaming Devices, Augustine must pay

6% of the Net Win from Gaming Devices 351+ into the RSTF, offset only by grants of up to

$50,000 per year to local government agencies and/or Caltrans for impacts or providing services

in connection with the Tribe's Gaming Activities, whether or not the balance in the RSTF in any year would suffice to distribute $1.1 million to each California Tribe eligible to receive distributions from the RSTF.

46.     By arbitrarily demanding that if Augustine were to operate more than 1,200 Gaming Devices, Augustine must pay into the RSTF 6% of the Net Win from Gaming Devices 351+ without regard to whether the balance in the RSTF would suffice to distribute $1.1 million to each Tribe eligible to receive distributions from the RSTF, the State sought to impose a tax, fee or assessment on Augustine's Gaming Activities that is impermissible under 25 U.S.C. § 2710(d)(4), and thus the State failed to negotiate in good faith.

47.     If the State's demand that Augustine annually pay 6% of its Net Win from Gaming Devices 351+into  the RSTF did not constitute  bad faith *per se*, the State was required to offer meaningful concessions in return for Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in good faith.

### COUNT THREE

**State's Insistence On Including The Tribal Nations Grant Fund**

48.     Throughout Augustine's negotiations for a new Compact, the State insisted that a new Compact must include a provision allowing surpluses in the RSTF to be transferred to the State-created Tribal Nations Grant Fund ("TNGF"), from which a State-created administrative body, using funds potentially provided in part by Augustine if Augustine operates more than 1,200 Gaming Devices, would award grants, potentially on a competitive basis, to Tribes eligible for distributions from the RSTF, subject to various restrictions as to how such grants may be used, including a prohibition against the use of grant funds for any gaming-related purpose.

49.     Throughout Augustine's negotiations for a new Compact, Augustine contended that the TNGF is not a proper subject of negotiation under any of the subsections of 25 U.S.C. § 2710(d)(3)(C), in that it is not directly related to and necessary for the regulation and licensing of Gaming Activities, does not create a standard for the operation of Gaming Activities or maintenance of a Gaming Facility, or is not otherwise directly related to the operation of Gaming Activities.

50.     As an alternative to the TNGF, in its February 3, 2020 Compact draft, Augustine proposed creating the RSTF II, from which RSTF-eligible Tribes would receive annual equal distributions of any amounts by which the balance in the RSTF exceeds what is necessary to distribute $1.1 million per year to each RSTF-eligible Tribe.  By September 17, 2021, the State had not provided a substantive response to Augustine's proposal to create the RSTF II.

51.     Notwithstanding Augustine's objection to the TNGF as not being a proper subject of negotiation, and the State's failure to provide a substantive response to Augustine's proposal to create the RSTF II, in the interest of reaching agreement on a new Compact, Augustine's July 2, 2021 draft Compact proposal included the TNGF, contingent on the State offering meaningful concessions in return.

52.     The State's demand that Augustine agree to include the TNGF in a new Compact and that Augustine's payments into the RSTF could be allocated to that fund if the RSTF contained more money than necessary to distribute $1.1 million per year to each RSTF-eligible Augustine, constituted a demand for direct taxation of Augustine, rather than an assessment to defray the State's legitimate regulatory costs, and thus constituted a failure by the State to negotiate in good faith.

53.     If the State's demand that a new Compact include the TNGF did not constitute bad faith *per se*, the State was required offer meaningful concessions in return for Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in good faith.

## COUNT FOUR

**State's Insistence That "Gaming Facility" Be Defined To Include Structures And Other Areas Of The Reservation In Which No Gaming Activities Occur**

54.     Throughout Augustine's negotiations for a new Compact, the State insisted upon defining "Gaming Facility" to include not only structures in which Gaming Activities actually are conducted, but also structures and other improvements on the Reservation in which no Gaming Activities occur.

55.     Insisting on defining "Gaming Facility" to include structures or areas of the Reservation within or upon which no Gaming Activities or activities directly related to Gaming

Activities are conducted is not a proper subject of negotiation under IGRA.  Therefore, the State's demand to include such a provision constituted a failure by the State to negotiate in good faith.

56.    To the extent that the State's demand to define "Gaming Facility" to include structures and areas of the Reservation within or on which no Gaming Activities are conducted did not constitute bad faith *per se*, the State was required to offer Augustine meaningful concessions in return for Augustine's acceptance of the State's demand; the State failed to do so, and thus failed to negotiate in good faith.

## COUNT FIVE

**State's Insistence On Defining "Gaming Operation" To Encompass Activities Or Functions Not Directly Related To The Operation of Gaming Activities**

57.    Throughout Augustine's negotiations for a new Compact, the State insisted upon defining "Gaming Operation" to include not only the actual operation of Gaming Activities and activities directly related to the operation of Gaming Activities, but also activities and areas of the Reservation that are not directly related to the Tribe's operation of Gaming Activities.

58.    By insisting on defining "Gaming Operation" to include activities and areas of the Reservation that are not directly related to the Tribe's operation of Gaming Activities, the State insisted upon including in a new Compact a provision that is not a proper subject of negotiation under IGRA, which demand constituted a failure by the State to negotiate in good faith.

59.    If the State's demand to define "Gaming Operation" as including not only the actual operation of Gaming Activities and activities directly related to the operation of Gaming Activities, but also activities and areas of the Reservation that are not directly related to the Tribe's operation of Gaming Activities, did not constitute bad faith *per se*, the State was required to offer meaningful concessions in return for Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in good faith.

/ / /

/ / /

/ / /

/ / /

COMPLAINT                                                17

**COUNT SIX**

**State's Insistence That Augustine Prohibit and Create Remedies In Money Damages For Workplace Discrimination, Harassment And Retaliation**

60.     As a federally recognized Indian Tribe, Augustine is expressly excluded from the definition of "employer" under 42 U.S.C. § 2000(e)(b) ("Title VII"), and 42 U.S.C. § 12111(5) ("ADA"), and various federal courts have held that federally recognized Indian Tribes are not subject to private lawsuits for money damages under other federal statutes dealing with workplace discrimination.

61.     Notwithstanding federal statutes that expressly exclude Augustine from the definition of "employer," and federal court decisions holding that Tribes such as Augustine are not subject to private suit for money damages under those statutes, the State insisted on including in a new Compact with Augustine the requirement that Augustine carry $3 million in employment practices liability insurance, and enact a tribal ordinance that not only prohibits workplace discrimination, harassment and retaliation, but also creates procedures for obtaining money damages against the Tribe for all persons seeking employment or employed by the Tribe's Gaming Operation.

62.     The State's Demand that Augustine carry $3 million in employment practices liability insurance and enact a tribal ordinance that both prohibits workplace discrimination, harassment and retaliation and creates procedures for obtaining  money damages against the Tribe for all persons seeking employment or employed by the Tribe's Gaming Operation, is not directly related to and necessary for the regulation and licensing of Gaming Activities, and thus is not a proper subject of negotiation under 25 U.S.C. § 2710(d)(3)(C), and the State's demand to include that provision in a new Compact constituted a failure by the State to negotiate in good faith.

63.     If the State's insistence that Augustine carry $3 million in employment practice liability insurance and enact an ordinance that not only prohibits workplace discrimination, harassment and retaliation, but also creates procedures for obtaining  money damages against the Tribe for all persons seeking employment or employed by the Tribe's Gaming Operation did not

constitute  bad faith *per se*, the State was required to offer meaningful concessions in return for Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in good faith.

## COUNT SEVEN

**State's Insistence On Including Prohibition Against Cashing Government Checks**

64.     Throughout Augustine's negotiations for a new Compact, the State insisted that a new Compact include a provision prohibiting Augustine's Gaming Operation from cashing, except for Augustine's tribal members, any check drawn against a federal, state, county, or city fund, including, but not limited to, Social Security, unemployment insurance, disability payments, or public assistance payments.

65.     Prohibiting the Tribe from cashing checks drawn against government accounts is not a proper subject of negotiation under IGRA, and the State's demand for such a provision in a new Compact constituted a failure by the State to negotiate in good faith.

66.     If the State's insistence upon including in a new Compact a provision prohibiting the Gaming Operation from cashing any checks drawn against a federal, state, county, or city fund did not constitute bad faith *per se*, the State was required to offer meaningful concessions in return for Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in good faith.

## COUNT EIGHT

**State's Insistence That Augustine Comply With California's Minimum Wage Law And Regulations**

67.     Although Augustine is subject to the federal Fair Labor Standards Act and its implementing regulations, throughout Augustine's negotiations for a new Compact, the State insisted that a new Compact include a provision requiring that Augustine comply with California's minimum wage law and implementing regulations for all Gaming Operation employees.

68.     California's minimum wage law and implementing regulations are not proper subjects of negotiation under IGRA, and the State's insistence on including such a provision

1     constituted a failure by the State to negotiate in good faith.

2          69.     If the State's insistence on including a provision requiring Augustine's Gaming

3     Operation to comply with California's minimum wage law and implementing regulations did not

4     constitute bad faith *per se*, the State was required to offer meaningful concessions in return for

5     Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in

6     good faith.

7                                    <u>**COUNT NINE**</u>

8     **State's Insistence That Augustine Enact A New Tort Liability Ordinance And Procedures**
       **For Remedies For Injuries Not Directly Related To Augustine's Gaming Activities**
9

10         70.     Throughout Augustine's negotiations for a new Compact, the State insisted  that a

11    new Compact include provisions requiring Augustine to obtain at least $7.7 million in liability

12    insurance to compensate persons who sustain bodily injury, personal injury and/or property

13    damage at or in connection with the Gaming Operation and/or Gaming Facility, whether or not

14    sustained while engaged in or as a consequence of the operation of class III Gaming Activities,

15    and enact an ordinance adopting California tort law and creating procedures for awarding money

16    damages to persons claiming such injuries or damage.

17         71.     Requiring creation of remedies in money damages for bodily injury, personal

18    injury and property damage other than for injury or damage sustained while participating in

19    Gaming Activities or caused by the operation of Gaming Activities is not a proper subject of

20    negotiation under 25 U.S.C. § 2710(d)(3)(C), and thus the State's demand to include such a

21    provision constituted a failure to negotiate in good faith.

22         72.     If the State's insistence on including in a new Compact a provision requiring

23    Augustine to create remedies in money damages for bodily injury, personal injury and property

24    damage other than for injury or damage sustained while participating in Gaming Activities or

25    caused by the operation of Gaming Activities did not constitute bad faith *per se*, the State was

26    required to offer meaningful concessions in return for Augustine's acceptance of that demand; the

27    State failed to do so, and thus failed to negotiate in good faith.

28    / / /

COMPLAINT                                        20

## COUNT TEN

**State's Insistence That Augustine Withhold And Remit To The State California Income Taxes On Gaming Operation Employees**

73.     Throughout Augustine's negotiations for a new Compact, the State insisted that a new Compact require that Augustine withhold and remit to the State California income taxes from the wages of all Gaming Operation and Gaming Facility employees (subject to certain exceptions), and file with the California Franchise Tax Board a copy of any information tax return filed with the Secretary of the Treasury, except for returns pertaining to enrolled Augustine tribal members living on the Augustine Reservation.

74.     The State's insistence that Augustine withhold and remit the aforementioned income taxes and informational returns is not a proper subject of negotiation under IGRA, and the State's demand to include that requirement constituted a failure by the State to negotiate in good faith.

75.     If the State's insistence on including in a new Compact the aforementioned California income tax withholding and reporting requirements did not constitute bad faith *per se*, the State was required to offer meaningful concessions in return for Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in good faith.

## COUNT ELEVEN

**State's Insistence That Augustine Enact A New State-Dictated Tribal Labor Relations Ordinance**

76.     As required by § 10.7 of its 2000 Compact, Augustine enacted and has maintained ever since the TLRO that the State previously had approved.

77.     Throughout the negotiations, the State insisted that Augustine enact a new State-drafted TLRO that would expand the rights of labor unions beyond those conferred by the National Labor Relations Act, 29 U.S.C. § 151, *et seq.*, and deprive Augustine of some rights that the NLRA confers on all other California non-tribal employers subject to the NLRA and the jurisdiction of the National Labor Relations Board ("NLRB").  The State never responded to Augustine's July 2, 2021 proposed revisions to the State's new TLRO, and despite repeated

1  requests by Augustine, the State never explained why Augustine's existing State-approved TLRO

2  is deficient in any way.

3        78.    Because Augustine's gaming operation is subject to the NLRB's jurisdiction, the

4  State has no legitimate interest in imposing on Augustine a labor-management relations regime

5  that deprives Augustine of rights under the NLRA and is unlike that applicable to any other

6  California non-tribal employer subject to the NLRB's jurisdiction, but in an effort to reach an

7  agreement, and contingent upon the State's offer of meaningful concessions on an issue or issues

8  about which the State is not otherwise obligated to negotiate in good faith, Augustine presented

9  the State with counterproposals to the State's new TLRO that incorporated many of the provisions

10  insisted upon by the State, but proposed more realistic time limits in connection with organizing

11  efforts, appointing election officers, scheduling representation elections, and collective

12  bargaining negotiations if a union is certified as the bargaining agent for an eligible bargaining

13  unit of Gaming Operation Employees, and substituted non-binding mediation for the State's

14  proposal that would empower a union to require that Augustine submit to binding interest

15  arbitration to resolve a collective bargaining impasse.

16        79.    The State never provided a substantive response to Augustine's July 2, 2021

17  counter-proposal to the State's proposed new TLRO.

18        80.    The State's insistence that Augustine enact the State's new TLRO was not a proper

19  subject of negotiation under IGRA and constituted a failure by the State to negotiate in good

20  faith.

21        81.    If the State's demand that Augustine accept the State's new TLRO did not

22  constitute bad faith *per se*, the State was required to offer meaningful concessions in return for

23  Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in

24  good faith.

25  **<u>COUNT TWELVE</u>**

26  **State's Insistence On Functionally Extending The State's Environmental Laws To**
**Augustine's Reservation**

27

28        82.    In enacting IGRA, Congress did not intend that States be permitted to use the

COMPLAINT                         22

1   compacting process to extend their jurisdiction beyond that necessary for the proper regulation,

2   licensing and safe and honest operation of Gaming Activities, and specifically not into areas such

3   as taxation, water rights or environmental regulation.

4          83.   Section 10.8.1 of Augustine's 2000 Compact requires Augustine to adopt an

5   ordinance,

6          providing for the preparation, circulation and consideration by
           Augustine of environmental impact reports concerning potential
7          off-Reservation environmental impacts of any and all Projects to be
           commenced on or after the effective date of this Compact. In
8          fashioning the environmental protection ordinance, Augustine will
           make a good faith effort to incorporate the policies and purposes of
9          the National Environmental Policy Act ["NEPA"] and the
           California Environmental Quality Act ["CEQA"] consistent with
10         Augustine's governmental interests.

11         84.   Since Augustine's Compact took effect in 2000, the State never has alleged that

12  Augustine has failed to fully comply with § 10.8.1 or any other provision of Augustine's 2000

13  Compact, that those provisions were inadequate to protect the State's legitimate interests, or that

14  Augustine's Gaming Activities ever have had a significant adverse impact on the off-Reservation

15  environment.

16         85.   Throughout Augustine's negotiations for a new Compact, and without offering any

17  Augustine-specific justification, the State insisted that a new Compact require Augustine to, *inter*

18  *alia*: (a) enact a new ordinance that incorporates "the relevant policies and purposes of NEPA

19  [National Environmental Policy Act] and CEQA [California Environmental Quality Act]

20  consistent with legitimate governmental interests of Augustine and the State;" (b) requires a

21  much more detailed and comprehensive environmental review of the potential significant adverse

22  impacts on the off-Reservation environment of broadly-defined proposed "Projects" that could

23  include activities not directly related to the operation of the Tribe's Gaming Activities; (c)

24  provide wide-ranging notice to the public and State and local government agencies of the

25  environmental review of proposed "Projects"; (d) prior to commencing certain Projects, offer to

26  negotiate, and if necessary arbitrate, with surrounding local governments and the California

27  Department of Transportation (if a State highway would be impacted) for binding and

28  enforceable agreements to mitigate a proposed Project's off-Reservation environmental and other

COMPLAINT                                              23

1    impacts; and (e) implement the mitigation measures identified in Augustine's environmental

2    document for the "Project."

3        86.    Although Augustine contended that the environmental provisions insisted upon by

4    the State are not proper subjects of negotiation under IGRA, in the interest of reaching an

5    agreement, and contingent on the State's offer of meaningful concessions, Augustine presented

6    the State with a counter-proposal based on NEPA rather than CEQA, and tailored for the

7    Augustine Reservation's specific circumstances, under which Augustine would have many of the

8    same obligations and authority regarding assessing and mitigating the significant impacts of a

9    Project on the off-Reservation environment as would a federal agency subject to NEPA.

10       87.    The State rejected many aspects of Augustine's proposed alternative to the State's

11   demand without substantial justification, and thus failed to negotiate in good faith.

12       88.    If the State's insistence that Augustine accept the State's proposed environmental

13   mitigation provisions did not constitute bad faith *per se*, the State was required to offer

14   meaningful concessions in return for Augustine's acceptance of that demand; the State failed to

15   do so, and thus failed to negotiate in good faith.

16                              **COUNT THIRTEEN**

17   **State's Insistence That the Compact Extend To Gaming Operation Employees Whose
     Duties Have No Direct Involvement In The Operation Of Gaming Activities**

18

19       89.    Throughout Augustine's negotiations with the State for a new Compact, the State

20   insisted that a new Compact include within the scope of the Compact Gaming Operation

21   employees personnel whose duties would not include involvement in the regulation, licensing or

22   operation of Gaming Activities.  By insisting on including within the scope of the Compact

23   Gaming Operation personnel not directly related to and necessary for the regulation, licensing or

24   operation of Augustine's Gaming Activities, the State's insistence on including such personnel

25   within the scope of the Compact was not a proper subject of negotiation under IGRA, and thus

26   constituted a failure to negotiate in good faith.

27       90.    If the State's insistence that a new Compact extend to personnel whose duties are

28   unrelated to the regulation, licensing or actual operation of Gaming Activities did not constitute

COMPLAINT                                        24

bad faith *per se*, the State was required to offer meaningful concessions in return for Augustine's acceptance of that demand; the State failed to do so, and thus failed to negotiate in good faith.

**WHEREFORE**, Augustine prays as follows:

1.      that the Court enter judgment declaring that as to each of Counts One through Thirteen of Augustine's Claim for Relief, the State of California has failed to negotiate in good faith as required by IGRA by insisting upon including in a new Compact provisions that are not proper subjects of negotiation under IGRA, or if not improper *per se*, that the State was obligated to offer meaningful concessions in return, and failed to offer such concessions;

2.      that the Court order the parties forthwith to enter into further Compact negotiations for a period not to exceed sixty (60) days from the entry of the Court's judgment, and if the parties are unable to agree to the terms of a new Compact within that time, to jointly file with the Court a report to that effect;

3.      that if the parties have not agreed on the terms of a new Compact within the sixty (60) days the Court allows for further negotiations, or sooner if the parties' negotiations have reached impasse, that either party may move the Court *ex parte* for an order appointing a mediator to whom Augustine and the State each will submit its respective last, best offer for a Compact, and the mediator shall select from the two proposed Compacts the one that best comports with the terms of IGRA and any other applicable Federal law and with the Court's findings and order, and submit that proposed Compact to the State;

4.      that if the State consents to the proposed Compact selected by the mediator within sixty (60) days after the date on which the proposed Compact is submitted by the mediator to the State, the proposed Compact shall be treated as a Tribal-State compact entered into under paragraph (3), with or without ratification by the California Legislature;

5.      that if the State does not consent to the proposed Compact submitted by the mediator, Augustine shall be entitled to obtain from the Secretary of the Interior procedures under which Augustine may continue to conduct Gaming Activities on its Indian lands;

6.      in the event that a new Compact with the State or Class III gaming procedures prescribed by the Secretary of the Interior has not taken effect prior to June 30, 2022, Augustine

1   may continue operating Gaming Activities pursuant to its 2000 Compact until the effective date

2   of either a new Compact or procedures prescribed by the Secretary of the Interior;

3          7.     that the Court grant such other relief as it deems appropriate;

4          8.     that Augustine be awarded its costs of suit and reasonable attorneys' fees; and

5          9.     that the State reimburse the Indian Gaming Special Distribution Fund in an

6   amount equal to what the State has charged that Fund for its defense of this action, plus interest

7   accrued at the same rate as California law imposes on debts owed to the State.

8

9   Dated: October 12, 2021                 Respectfully submitted,

10

11                      By:  /s/ George Forman
                       George Forman

12                          FORMAN & ASSOCIATES
                       Attorneys for Plaintiff