UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUGUSTINE BAND OF CAHUILLA INDIANS,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>STATE OF CALIFORNIA and GOVERNOR GAVIN NEWSOM, in his official capacity,<br><br>　　　　　Defendants. | Case No. 5:23-cv-00620-SSS-DTBx<br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Dkt. 57] AND DENYING AS MOOT PLAINTIFF'S REQUEST FOR RULING [Dkt. 68]** |

Plaintiff Augustine Band of Cahuilla Indians, a federally recognized Indian Tribe, brings this action for judicial review under the Indian Gaming Regulatory Act (IGRA) against Defendants California (the "State") and Governor Gavin Newsom in his official capacity. The Tribe alleges that Defendants have failed to negotiate in good faith for a renewed Tribal-State Compact that would allow the Tribe to continue to conduct Class III gaming activities at its casino.

Now before the Court is the Tribe's motion for summary judgment. [Mot. (Dkt. 57); Mot. Brief (Dkt. 58-1)]. The motion has been fully briefed [Opp. (Dkt. 60); Reply (61)]. The Court held a hearing, at which counsel for all parties provided oral argument, on March 8, 2024. [Dkt. 66]. The matter was then taken under submission.

For the reasons provided below, the Court **GRANTS** the Tribe's motion for relief as provided under 25 U.S.C. § 2710(d)(7)(B). The Court **GRANTS** the Tribe's request for further declaratory relief as to the First, Second, Third, Seventh, Ninth, Tenth, and Twelfth Causes of Action[1] and **DENIES** such relief as to the Fourth, Fifth, Sixth, Eighth, Eleventh and Thirteenth Causes of Action.

The Tribe's request for ruling is **DENIED AS MOOT**. [Dkt. 68].

The parties are **DIRECTED** to review **Part V** for further instructions in light of this order.

**I.     CLASS III GAMING COMPACTS UNDER THE INDIAN GAMING REGULATORY ACT (IGRA)**

The Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 *et seq.*, provides that an Indian Tribe may conduct high-stakes casino gambling (or

---

[1] As discussed in **Part III** below, Defendants concede that the compact terms described in the Tribe's Ninth and Twelfth Causes of Action exceeded the proper scope of negotiations under IGRA. The Court therefore grants as unopposed the Tribe's request for declaratory relief as to these two claims.

-2-

1  "Class III" gaming) on its lands only by negotiating a gaming compact with the
2  government of the relevant state.  To "prevent states from using their compact
3  approval authority to force regulations on tribes that the states would otherwise
4  be powerless to enact," Congress included in IGRA certain important
5  "safeguards" on these negotiations.  *Chicken Ranch Rancheria of Me-Wuk*
6  *Indians v. California*, 42 F.4th 1024, 1032-33 (9th Cir. 2022) ("*Chicken*
7  *Ranch*").  In particular, IGRA limits the scope of bargaining topics for Class III
8  compacts, 25 U.S.C. § 2710(d)(3)(C); prohibits the State from using the
9  compacting process to tax Tribal gaming operations except to the extent
10 necessary to recoup its regulatory expenses, *id.* at § 2710(d)(4); and obligates
11 the State to negotiate compacts in good faith, *id.* at § 2710(d)(3)(A).

12 The first of these "safeguards" provides that the State may only seek to
13 negotiate compact terms that are "directly related to the operation of gaming
14 activities." *Chicken Ranch*, 42 F.4th at 1029.  This requires more than a "but-
15 for" chain of causation linking the Tribe's gaming activity to "some situation or
16 event [that] the state now believes it is imperative to regulate." *Id.* at 1039.
17 Rather, the State must show that its proposed regulation addresses some aspect
18 of Tribal gaming, consistent with the interests in "mitigation of organized crime
19 and unfair gaming practices" that justified IGRA's "limited extension of
20 regulatory authority [over Tribal lands] to the states." *Id.*

21 Second, IGRA generally prohibits the State from including compact terms
22 that would obligate the Tribe to share its gaming revenue with the State.  Per 25
23 U.S.C. § 2710(d)(4), the State may require the Tribe to make payments in "such
24 amounts as are necessary to defray the costs of regulating [Class III gaming],"
25 *see id.* at § 2710(d)(3)(C)(iii), but otherwise may not use the compacting
26 process to "impose" any tax, fee or assessment, unless it offers the Tribe some
27 economically valuable "meaningful concession" in exchange.  *Rincon Band of*
28 *Luiseño Indians v. Schwarzenegger*, 602 F.3d 1019, 1036 (9th Cir. 2010); *see*

*also Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095, 1101 (9th Cir. 2006) (although the state "does not have the *authority* to exact such payments," it can "bargain to receive them in exchange for a quid pro quo conferred in the compact") (emphasis in original).

Finally, IGRA requires that the State participate in compact negotiations in "good faith." The Tribe may enforce this obligation by filing suit in federal court if the parties have failed to reach a compact agreement within 180 days of the Tribe's initial request to negotiate.

In evaluating a claim that the State has failed to negotiate in good faith, Courts "shall consider any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence" against the State. The Court also "may take into account" concerns as to "public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities." 25 U.S.C. § 2710(d)(7)(B)(iii). Where the Court finds that the State's disputed compact provisions fall "well outside IGRA's permissible topics of negotiation," the State has acted in bad faith *per se*. *Chicken Ranch*, 42 F.4th at 1034.

If the Court concludes that the State has not met its good-faith obligations, it "shall order" the parties to an additional 60 days of negotiation. If that process does not yield an agreement, the Court must then appoint a mediator and direct both the State and the Tribe to submit to the mediator their respective "last best offer[s]" for a compact. The mediator "shall select from th[ese] two proposed compacts the one which best comports" with IGRA, any "other applicable Federal law," and the "findings and order of the court."

If the State consents to the mediator's chosen draft, that version becomes the final compact. If the State does not consent, the matter is referred to the Secretary of Interior to draft and impose a compact consistent with the draft selected by the mediator, with IGRA, and with any relevant provisions of state law. 25 U.S.C. § 2710(d)(7)(B).

## II. FACTUAL BACKGROUND

The Tribe currently operates a Class III gaming facility pursuant to a Tribal-State Compact (the "Current Compact"), finalized shortly after California legalized casino-style gaming by tribal entities in March of 2000. [Compl. (Dkt. 1) at ¶ 14]; *see* Part IV-A below. The Current Compact allows the Tribe to operate up to two Class III Gaming Facilities and up to 2,000 Gaming Devices. [SUF No. 5].

In advance of the Current Compact's December 2020 expiration date, the Tribe contacted the State to initiate negotiations for a new gaming compact sometime in August 2019.[2] Despite two years of sustained negotiations, the parties were unable to agree upon a finalized compact. [Compl. at ¶¶ 20, 22-24].

The Tribe filed this lawsuit in October 2021. Its complaint includes thirteen causes of action, each identifying a different provision in the State's proposed compact and alleging that it exceeds the permissible scope of negotiation topics under IGRA or seeks to impose an improper tax on the Tribe. The Tribe seeks declaratory relief as to whether these disputed terms comply with IGRA's requirements, and further asks that the Court enter judgment directing the parties to proceed with the remedial process prescribed by 25 U.S.C. § 2710(d)(7)(B)(iii)-(vii).

The Tribe now moves for summary judgment on all causes of action.

## III. JUSTICIABILITY

The State concedes that two compact terms identified in the Tribe's complaint do not, in fact, bear the necessary "direct relationship" to "gaming

---

[2] The parties have since agreed to postpone the Compact's expiration to December 31, 2024. [SUF No. 7].

operations" necessary to fit within IGRA's catch-all provision. As the State acknowledges, its insistence on these "off-list" terms constitutes bad faith *per se* and triggers IGRA's remedial provisions.

The State now contends that its admission of bad faith resolves the dispute raised in the complaint and urges this Court to refuse the Tribe's request for further declaratory relief as to its eleven remaining causes of action. It argues that such relief would amount to an "advisory opinion" which "this Court has no jurisdiction to provide" and "would not change the outcome" of this case. [Opp. at 11].

The Court finds little justification for the State's proposed limitation, either in the text of IGRA itself or the practice of courts within this Circuit. The State argues that the procedures set forth at 25 U.S.C. § 2710(d)(7)(B)(iii)-(vii) constitute IGRA's "sole remedy" where a Tribe alleges that a State has violated its Class III compacting obligations. [Opp. at 10-11]. But nothing about this portion of the statute suggests that Congress intended for IGRA's remedial process to *displace* other potential remedies, including declaratory relief.

Indeed, portions of IGRA's remedial provisions appear to contemplate the type of judicial guidance sought by the Tribe here. In particular, the statute instructs the court-appointed mediator to take into account the "findings and order of the court" in choosing between the parties' respective "last best" compact offers. If the Court were in fact required to limit its consideration of the Tribe's IGRA claims to the kind of binary good faith-bad faith determination the State now requests, this provision would make little sense: it is difficult to imagine how such an order could possibly assist a mediator in evaluating the parties' proposed compacts.

Finally, the Court is neither bound nor persuaded by the district court decisions cited by the State in this portion of its opposition. [Opp. at 10]; *Yavapai-Prescott Indian Tribe v. Arizona*, 796 F. Supp. 1292, 1294, 1296, 1298

-6-

(D. Ariz. 1992) (declining to provide the Yavapai-Prescott Indian Tribe declaratory relief regarding whether a particular act involving gaming was "within the meaning of [IGRA]"); *Alturas Indian Rancheria v. Newsom*, No. 22-01486, 2024 WL 871034 at *5 (E.D. Cal, Feb. 28, 2024) (finding that the State's insistence on environmental and tort law provisions qualified as bad faith *per se*, triggering IGRA's remedial provisions, and so declining the Tribe's request for an "order directing the parties as to" its remaining IGRA allegations). As the State ultimately acknowledged at oral argument, the scope of declaratory relief available to the Tribe is a question committed to the Court's discretion. Here, the Court chooses to exercise this discretion more expansively than did the District of Arizona or the Eastern District in the cases cited above.

The Court, however, finds it appropriate to limit the scope of its review to conserve scarce judicial resources and to respect Congress's intent to allow for a genuine negotiating process between two co-equal sovereigns.

Thus, for each of the eleven still-disputed terms, the Court first asks whether it "*substantially* exceed[s]" IGRA's permissible topics of negotiation. *Chicken Ranch*, 42 F. 4th at 1041. The Court will not attempt to resolve those "close cases" in which a State may have "slightly overstep[ped] the 'directly related' to the operation of gaming activities line." *Id.* at 1037.

Second, where applicable, the Court will ask if the term seeks to "impose a tax" upon the Tribe in contravention of Section 2710(d)(4).

With this framework in place, the Court now turns to the Tribe's motion for declaratory relief on the remaining eleven causes of action.

### IV. DISCUSSION

**A. Revenue-Sharing Provisions (First, Second, and Third Causes of Action)**

The Tribe's first three causes of action concern the State's proposed revenue-sharing provisions. In its most recent compact draft, the State demands

that the Tribe make payments into three state-administered funds: (1) the Revenue Sharing Trust Fund (RSTF); (2) the Special Distribution Fund (SDF); and (3) the Tribal Nations Grant Fund (TNGF). The Tribe argues that these provisions both lack a sufficient "direct relationship" to gaming operations and "seek to impose a tax" in violation of IGRA's safeguards.

The RSTF provides an annual grant of $1.1 million to each federally recognized California tribe operating fewer than 350 Gaming Devices. The SDF is available for appropriation by the State legislature to cover "grants …for programs designed to address gambling addiction," "grants…for the support of state and local government agencies impacted by tribal gaming," "compensation for regulatory costs incurred by the State Gaming Agency and the state Department of Justice in connection with the implementation and administration of the Compact," and "payment of any shortfalls specified by the legislature."

In *Coyote Valley II*, the Ninth Circuit determined that compact terms requiring payments into the SDF and RSTF fit within IGRA's catch-all provision, because these funds were designated for purposes "directly related to the operation of gaming activities" and consistent with the purposes of IGRA. *In Re Indian Gaming Related Cases*, 331 F.3d 1094, 1112-14 (9th Cir. 2003) ("*Coyote Valley II*"). The Tribe offers no rationale to support a different conclusion here.

The TNGF, established by the California Legislature in 2014, awards competitive grants to non-gaming and limited-gaming California Tribes for "purposes related to effective self-governance, self-determined community, and economic development." [Opp. at 28]. Because the TNGF is designated for much the same purposes approved in *Coyote Valley II* in connection with the RSTF and SDF, the Court cannot conclude that the State's provision requiring TNGF payments "substantially exceeds" IGRA's limitations.

        However, the Court readily finds that the State's insistence on these revenue-sharing provisions violates Section 2710(d)(4)'s prohibition on taxes, fees, or assessments. Each of these three funds is intended for uses other than recouping state regulatory costs, so that the State may demand financial contributions from the Tribe only if it offers some "meaningful concessions" to the Tribe in return. *Rincon*, 602 F.3d at 1033.

        The State argues that it has offered the Tribe "authorization to conduct class III gaming exclusive of non-tribal operators for an additional term of years" in exchange for its payments into the funds [Opp. at 20]; [*see also* Opp. at 29] ("the exclusivity provided by the State provides ongoing value for the types of revenue sharing").

        This is not sufficient consideration for the State's present revenue demands, because tribal exclusivity in casino gaming is a "right that the [T]ribe already fully enjoys as a matter of state constitutional law." *Rincon*, 602 F.3d at 1037. Moreover, the state constitutional amendment that established this exclusivity was "already…used as consideration for establishment of the RSTF and SDF" in the Current Compact. The State "cannot use exclusivity as new consideration" for its further demands for revenue sharing.[3] *Id.*

        The Court does not today reach the question of whether the term requiring contributions to the TNGF exceeds IGRA's subject matter limitations. But at a

---

[3] Like many other gaming tribes in California, the Tribe entered into its Current Compact shortly after California voters approved a state-sponsored constitutional amendment ("Proposition 1A") in March of 2000. Prior to the amendment, the California constitution had banned casino-style gaming outright. Proposition 1A allowed tribes, and tribes alone, to lawfully conduct Class III gaming within the State. *Rincon*, 602 F.3d at 1023, citing *Coyote Valley II*, 331 F.3d at 1103. In exchange for this valuable statewide monopoly, the State required that the Tribe contribute to both RSTF and SDF. *Rincon*, 602 F. 3d at 1037; [Reply at 11, 12].

minimum, if the State wishes to include any of its three revenue-sharing provisions in the final compact, it must offer the Tribe some meaningful concession beyond the statewide exclusivity already conferred by Proposition 1A.

### B. Prohibition on Cashing Government-Issued Checks (Seventh Cause of Action)

In its Seventh Cause of Action, the Tribe contests the State's draft term prohibiting its Gaming Operation from cashing any check drawn against a federal, state, county, or city fund.

The State argues that this provision falls within IGRA's catch-all provision because "the use of cash, after conversion into chips, to place bets is necessary to the operation of the Gaming Activities and the Gaming Facility." [Opp. at 18]. But, as the Tribe points out, the State's check-cashing restriction would equally restrict transactions with no discernible relationship to gaming operations: the Gaming Facility's check cashing service does not "inquire how check proceeds will be spent," much less "require that the proceeds be used to purchase chips or gambling tokens." [Reply at 19]. For this reason, the Court finds that the compact term at issue in the Tribe's Seventh Cause of Action falls outside the permissible scope of negotiations under IGRA.

### C. Tax Withholding from Gaming Employees' Paychecks (Tenth Cause of Action)

Next, the Tribe disputes the State's compact term requiring it to withhold and remit state taxes owed by all "persons employed at the Gaming Operation or Gaming Facility" (Tenth Cause of Action). The Tribe maintains that both of these provisions seek to regulate matters far beyond IGRA's catch-all provision. The Court agrees.

The language in § 2710(d)(3)(C)(vii) requires an "affirmative showing that the state is seeking to negotiate over a subject that has a direct relationship

to the operation of gaming activities." In *Chicken Ranch*, the Ninth Circuit considered the plaintiff-tribe's challenge to a proposed compact term mandating that the tribe pass ordinances requiring its tribal courts to recognize and enforce state-court-issued spousal and child support orders against gaming employees and requiring its gaming facility to withhold and remit unpaid support from employees' paychecks. 42 F. 4th at 1037-38.

There, the state maintained that this provision was directly related to gaming operations because "without Indian gaming activities, there would be no wages of employees that could be garnished for spousal and child support orders." However, the *Chicken Ranch* Court found that the true subject of this regulation was "child and spousal support orders," which themselves bear "no direct relationship whatsoever to the operation of gaming activities." *Id.* at 1039.

Here, the State contends that its tax remittance provision is directly related to gaming operations because it seeks to regulate wages earned at the Gaming Facility. [Opp. at 37]. The *Chicken Ranch* court rejected a closely analogous argument when offered by the State in support of the garnishment provision described above, and this Court sees no reason that it should reach a different result now. It therefore concludes that the compact term described in the Tribe's Tenth Cause of Action well exceeds the bounds of permissible negotiation topics under IGRA.

### D.  Defined Terms (Fourth, Fifth, and Thirteenth Causes of Action)

The Tribe challenges as overbroad the State's proposed definitions of three terms within the draft compact: "Gaming Facility" (Fourth Cause of Action), "Gaming Operation" (Fifth Cause of Action), and "Gaming Employee" (Thirteenth Cause of Action).

Based on the Court's review of Ninth Circuit precedent and the Tribe's cursory briefing of these issues, the Court cannot conclude that any of the three

so plainly exceed IGRA's limitations as to support declaratory relief at this stage.

### E. Labor Regulation Provisions (Sixth, Eighth, and Eleventh Causes of Action)

Three of the Tribe's causes of action concern State compact terms regulating labor conditions and labor rights of Gaming Operation employees. These terms would require that the Tribe:

(1) Carry $3 million in employment practices liability insurance; enact a Tribal ordinance prohibiting workplace discrimination, harassment, and retaliation; and waive sovereign immunity in suits for money damages by all persons seeking employment or employed by the Tribe's Gaming Operation (Sixth Cause of Action);

(2) Comply with California's minimum wage laws as to all Gaming Operation Employees (Eighth Cause of Action);

(3) Modify its existing TLRO to shorten the period for collective bargaining by Gaming Operation Employees and require that the Tribe submit to binding arbitration for any remaining unresolved issues. (Eleventh Cause of Action).

Although the Court acknowledges that these provisions may be expensive for and disadvantageous to the Tribe, it cannot find that the State has substantially exceeded IGRA's subject-matter limitations by negotiating for them.

In *Coyote Valley II*, the Ninth Circuit held that compact terms regulating labor conditions for workers at the plaintiff tribe's casino fell within IGRA's catch-all provision. It reasoned that because "labor at the casinos [is] necessary to gaming activities and inseparable from gaming itself," the "regulation of that indispensable element of a casino's gaming operation was directly related to the

operation of gaming activities." *Chicken Ranch*, 42 F. 4th at 1036 n.2, citing *Coyote Valley II*, 331 F.3d at 1116.

The differences between the labor regulations at issue here and those approved in *Coyote Valley II* is one of degree, rather than kind. The Court does not read that decision, or any other case cited by the Tribe, to suggest that a compact term directed to an otherwise on-list topic may be deemed off-list merely because it is "unreasonable," "unnecessary," or even because it requires the Tribe to comply with more onerous regulations than those applied to other non-tribal employers in the state. [*See* Reply at 22].

The Tribe also contends that the State's labor regulation provisions exceed IGRA's limitations because they purport to reach employees or facilities not "directly related" to gaming activities. These arguments rely on the Tribe's premise that the State's definitions of "gaming employee," "gaming facility," and "gaming operation" sweep too broadly; the Court therefore rejects them for the same reasons set forth in Part IV-D above.

For these reasons, the Court declines to enter declaratory relief as to the Tribe's Sixth, Eighth, and Eleventh Causes of Action.

## V.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** the Tribe's motion for summary judgment for relief under 25 U.S.C. § 2710(d)(7)(B) and retains jurisdiction. The Court **GRANTS IN PART** the Tribe's request for declaratory relief, consistent with the reasoning and conclusions set forth in **Part IV** of this Order. The Tribe's request for ruling is **DENIED AS MOOT**. [Dkt. 68].

The Court **DIRECTS** the parties to proceed under IGRA's remedial framework under the Court's continued supervision. This framework first requires the parties resume negotiations to conclude a Tribal-State gaming compact within sixty days of the filing of this order. The Court directs the parties to file a Joint Status Report on or before **Monday, September 23, 2024**,

informing the Court whether the parties have concluded a compact or whether they will proceed with the next step in the remedial process and "each submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact." 25 U.S.C. § 2710(d)(7)(B)(iv).

The Court further **SETS** a status conference in this matter for **Friday, September 27, 2024** at **1 P.M.** via Zoom. This conference will be vacated if the Joint Status report is timely submitted and is sufficiently detailed to allow the Court to proceed without further input from the parties.

**IT IS SO ORDERED.**

Dated: July 23, 2024

SUNSHINE S. SYKES
United States District Judge